2021 IL App (1st) 182206-U

No. 1-18-2206

Order filed December 30, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| EUGENE POSEY, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Petitioner-Appellee/Cross-Appellant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SUPERINTENDENT OF POLICE OF THE | ) | |
| CITY OF CHICAGO, | ) | No. 17 CH 13108 |
| | ) | |
| Respondent-Appellant/Cross-Appellee, | ) | |
| | ) | |
| And THE POLICE BOARD OF THE CITY OF | ) | |
| CHICAGO, | ) | Honorable |
| | ) | Peter A. Flynn, |
| Respondent. | ) | Judge Presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We reverse the circuit court's order that reversed the Police Board of the City of Chicago's original decision to terminate petitioner Eugene Posey's employment. The Chicago Police Board's original decision is affirmed, where (1) its factual findings were not against the manifest weight of the evidence, and (2) its decision to terminate Petitioner's employment was not arbitrary, unreasonable, or unrelated to the requirements of service.

¶ 2        Respondent, the Superintendent of the Chicago Police Department (Superintendent) appeals from a June 14, 2018 order of the circuit court of Cook County reversing the City of Chicago Police Board's (Board) final administrative decision that ordered petitioner Eugene Posey's discharge from his position as a police officer for the City of Chicago. Petitioner cross-appeals from a September 18, 2018 order of the circuit court of Cook County that affirmed the five-year suspension imposed by the Board on remand, arguing the suspension is, effectively, a discharge from the police force.

¶ 3        For the following reasons, we reverse the circuit court's June 14, 2018 order vacating Petitioner's termination.[1]

¶ 4                                I. JURISDICTION

¶ 5        On August 25, 2017, the Board issued its decision finding Petitioner guilty of violating various Rules of Conduct and discharging him from his position as a police officer. Petitioner filed a complaint for administrative review on September 28, 2017. The circuit court reversed the Board's discharge order and remanded for imposition of a lesser sanction. On remand, the Board issued a new order suspending Petitioner for five years and the circuit court affirmed the Board's five-year suspension order later that month. Both the Superintendent and Petitioner filed timely notices of appeal thereafter. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1980, art. VI, § 6) and Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303(a) (eff. July 1, 2017), governing appeals from a final judgment of a circuit court in a civil case.

¶ 6                                II. BACKGROUND

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 7    Eugene Posey was sworn in as a Chicago police officer on December 13, 1999. On December 12, 2016, almost seventeen years to the date of his swearing in, the Superintendent filed charges against Petitioner, alleging, in 25 counts, that he had committed the following six Department rules of conduct violations:

"Rule 1: Violation of any law or ordinance.

Rule 2: Any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department.

Rule 6: Disobedience of an order or directive, whether written or oral.

Rule 8: Disrespect to or maltreatment of any person, while on or off duty.

Rule 9: Engaging in any unjustified verbal or physical altercation with any person, while on or off duty.

Rule 10: Inattention to duty."

¶ 8    Specifically, the Superintendent asserted that, while on duty on May 12, 2014: (1) Petitioner seized and/or arrested and/or detained Corey Stewart without justification, in violation of Rules 1, 2 and 8; (2) Petitioner handcuffed and/or arrested and/or placed Stewart in his police vehicle and transported him to McKinley Park, without justification and/or against Stewart's will, instead of immediately transporting him to the 9th District police station[2], in violation of Rules 1, 2, 6, 8, and 10; (3) Petitioner handcuffed Stewart too tightly, in violation of Rules 2 and 8; (4) Petitioner slapped and/or punched Stewart, in violation of Rules 2, 8, and 9; (5) Petitioner transported Stewart to, and subsequently abandoned him at, McKinley Park in violation of Rules 2 and 8; (6) Petitioner handcuffed and/or arrested Stewart and/or subsequently transported him without (a) notifying the dispatcher via voice radio of the incident and his change in availability

_____

[2]Petitioner testified that the 9th District police station is located at 3120 South Halsted, in Chicago.

status, and (b) completing all necessary reports and/or reporting procedures and advising proper supervisors, in violation of Rules 2, 6, and 10.

¶ 9    In answer to these charges, Petitioner gave a statement to the Independent Police Review Authority (IPRA) on August 11, 2015. Petitioner stated he was working with Chicago police officer Jonas Dodoo when they encountered Corey Stewart outside the Chicago Transit Authority (CTA) Red Line Garfield station. Petitioner explained that he had arrived by vehicle at the station to do a premises check when he observed Stewart, who was "walking with a real, you know, kind of lean walk" and was "mean mugging"[3] the officers. He extrapolated that Stewart had a "bad walk," and the way Stewart was walking was "suspect." Petitioner then observed Stewart spit in front of the front passenger tire of their unmarked police vehicle. Petitioner asked Stewart, "what's your problem," and Stewart responded, "I don't have no f*** problem." As Petitioner exited the vehicle, Stewart approached him with "his shoulders up." Petitioner clarified that he did not stop Stewart because of the way he was walking, but rather because he felt Stewart was going to rush at him and he felt assaulted[4] by Stewart's attitude and his walk. Petitioner did not feel safe, so he detained Stewart and placed him in handcuffs. Petitioner explained that "we're going to take him to the 9th District Police station and we were going to arrest him." Later, Petitioner equivocated between explaining that Stewart was under arrest and then that Stewart was "not entirely" under arrest but was not free to go.

---

[3]Petitioner clarified that "mean mugging" meant Stewart "had this real, you know, mean look like as if, you know, either one of us had did something to him, you know, it's just with a mean, you know, ugly face."

[4]Petitioner explained that he felt assaulted because of Stewart's "aura, you know, coming at me, you know, with that walk and with that same facial expression." Further, he detailed that Stewart's look was "terrifying" and his walk was "a sign of somebody who's capable, you know, of, you know, committing a battery."

¶ 10        Petitioner stated that he and officer Dodoo were driving towards the police station when Petitioner conversed with Stewart and determined Stewart had had a bad day and was not a bad guy. During the conversation, Stewart told Petitioner he was "going west" and while the address was too far west for the officers to take Stewart, they drove him as far west as they could. They stopped in front of a park, although Petitioner was not sure what park, and Petitioner then removed Stewart from the vehicle. Stewart seemed happy that Petitioner was letting him go, so Petitioner took the handcuffs off, completed a contact card, and Stewart began to walk west. Petitioner denied that he told his partner they should drop Stewart at "the basketball court," but did concede that they did ultimately drop him off by a basketball court. However, Petitioner stated he was "doing [Stewart] a favor of getting him closer to where he wanted to go." Petitioner denied that he had either handcuffed Stewart too tightly, slapped, or punched him. Petitioner stated he completed a contact card after the interaction, his only contact card for the shift, and turned it in to his sergeant because he was not allowed to input the card himself.

¶ 11        During his statement, the investigator showed Petitioner a document which reported all contact cards completed by Petitioner on May 12, 2014. The only contact card on the report was for an unrelated individual at 5:47 p.m. near the 69th Street Red Line station. Petitioner stated that he did not personally inform the Office of Emergency Management and Communications (OEMC) dispatchers of the incident with Stewart but thought that either he or Dodoo had reported it. The investigator interviewing Petitioner also showed him various reports wherein the officers indicated that their police vehicle had been at the CTA Red Line 69th Street station at 9:23 p.m., despite the police vehicle GPS placing the officers at 47th Street and Halsted.

¶ 12        On June 20 and June 22, 2017, a hearing was held on the Superintendent's charges. The following evidence was presented to Hearing Officer Jacqueline A. Walker.

¶ 13        Petitioner was first called as an adverse witness. Petitioner testified that, on May 12, 2014, he was assigned—along with Jonas Dodoo—to the public transportation unit of the Department. Petitioner was tasked with surveilling the Red Line CTA stations and outdoor platforms for illegal activity. Petitioner and Dodoo were patrolling in plain clothes, in an unmarked police vehicle. Around 9:17 p.m., the officers arrived in the vicinity of the CTA Red Line Garfield station, at approximately 220 West Garfield Boulevard in Chicago. Dodoo parked the undercover vehicle roughly 10 feet from a bus stop located directly outside the Garfield Red Line station. It was then that Petitioner observed Corey Stewart standing near the bus stop, with "a dirty look" upon his face. Petitioner approached Stewart, placed him in handcuffs, and put Stewart in the back seat of the police vehicle. Petitioner did not loosen Stewart's handcuffs at any point, because Stewart never complained that they were too tight.

¶ 14        Petitioner denied that Stewart was under arrest. He likewise denied telling Dodoo to "take [Stewart] to the basketball court. We're not going to do him like the last one and take him to Rogers Park." When asked if an individual arrested near the Red Line stop would have to be transported to the 9th District police station for processing, Petitioner opined that "there is a little small window in between the time a person gets handcuffed in between -- and the time they arrive to the station that, you know, there's a little discretion there." Petitioner testified he could not recall if he had notified the dispatcher via radio after taking Stewart into custody. At approximately 9:29 p.m., the officers arrived at McKinley Park, located at 2210 West Pershing Road. Petitioner testified he did not know that they were at McKinley Park, but he later learned there was a basketball court located within the park. After exiting the vehicle, Petitioner removed Stewart from the backseat, while Dodoo remained in the vehicle. Petitioner denied that he slapped and punched Stewart multiple times while Stewart was handcuffed. When Stewart requested Petitioner's name, Petitioner

provided it. Petitioner then removed the handcuffs from Stewart and got back into the police vehicle. At approximately 9:55 p.m., the officers left Stewart at McKinley Park and drove back to the 1st District police station, located at 18th Street and Clark Street. Petitioner admitted Stewart never asked to be driven to McKinley Park and maintained that he did not know the park even existed. He could not recall if he had informed OEMC dispatchers of his encounter with Stewart.

¶ 15    Corey Stewart testified that he was a loss prevention officer for Morrison Security at Whole Foods. Shortly after his shift ended around 8:00 p.m., Stewart—who resided at in the 800 block of West 53rd Street in Chicago—headed to the Red Line so he could return home. After getting off the Red Line train at the Garfield stop, Stewart headed outside the station to wait for the bus. As Stewart had a cold that day, he had mucus in his mouth and stepped to the curb to spit the mucus into the street. While Stewart admitted he spat into the street behind a parked vehicle, he maintained he was unaware it was a police vehicle. Further, Stewart explained he spat into the street because it would have been disrespectful to spit in front of everybody waiting for the bus. Following his expectoration, two police officers in plain clothes got out of a nearby vehicle and summoned him over to their car. One officer, whom Stewart later identified as Petitioner, demanded Stewart put his hands behind his back and then very tightly placed handcuffs on him. Stewart had never seen either of the police officers before and he did not discover they were police officers until after they had handcuffed him. When Stewart inquired as to why he was being handcuffed, Petitioner responded, "You say f*** us, so it's f*** you." Stewart told Petitioner the handcuffs were too tight, and Petitioner again stated "f*** [you]" and put Stewart in the backseat of his police vehicle. Stewart testified he felt a throbbing, numb feeling in his wrist and parts of his fingers from the tightness of the handcuffs.

¶ 16       Petitioner then got into the front passenger seat of the police vehicle and stated to his partner that "[w]e gonna take this one to the basketball court." Petitioner's partner then drove off, "like he knew exactly where to go." Petitioner stated that "the last mother f*** who did this, we took him to Rogers Park and made him walk back." Stewart again asked "[w]hat is this all about?" and Petitioner responded, "[f]*** you. You saying f*** us, it's f*** you." Stewart never heard either police officer use the radio to notify dispatchers of the encounter. Eventually, the vehicle stopped, and Petitioner removed Stewart from the vehicle and told his partner to drive off. Stewart observed a basketball court and an abandoned building across the street but had no idea where they were. After the police vehicle drove off, Petitioner slapped Stewart a few times and punched him in his side. Stewart then began to "play a role" and asked Petitioner for his name so he could address him with proper respect; Petitioner responded with his name. A few minutes later, Petitioner's partner returned, and Petitioner searched Stewart. When Petitioner found Stewart's loss prevention badge, he tossed it to his partner, who had exited the vehicle, and stated, "hmmm, [t]his mother f*** think he the police." Stewart attempted to explain that he did not believe he was the police, and that he was simply an undercover loss prevention officer for Morrison Security. Because he was scared, Stewart did not disclose to Petitioner's partner that Petitioner had slapped and punched him, nor did he attempt to scream to anyone on the basketball court.

¶ 17       Eventually, Petitioner and officer Dodoo left Stewart and drove off. Stewart did not know where he was, so he called 911 to request a supervisor so that he could report what happened and get home. However, after he made the phone call, he became concerned that Petitioner might hear the call on the radio and return to the area. Feeling afraid, he called his mother and told her, "Ma, anything happen to me, Officer Posey did it," before his cell phone battery died. Stewart waited five or ten minutes in the unfamiliar neighborhood before he began walking down 39th Street.

When he reached Ashland Avenue, he saw an open gas station. He entered the station, explained his situation to the man working, and requested to use the phone to call 911. After making the 911 call, Stewart remained at the gas station for 40 to 45 minutes and no police officers arrived. As he did not know his mother's phone number by heart, and his cell phone was dead, he decided to leave the station so he could get home and let his mother know he was okay. Stewart saw the Ashland bus drive past and decided to take the bus to get out of the neighborhood. Once he arrived home, he called his mother. As a result of the encounter, Stewart had a bruised right wrist, some numbness in his right hand, a little side pain, and a bad headache. The next day, his mother drove him to Christ Medical Center's emergency room, where he sought treatment for his injuries.

¶ 18    Stewart viewed video surveillance of the Garfield Red Line Station from the night in question and identified himself walking to the curb and spitting into the street. He also listened to the audio recordings from his two 911 calls and identified himself as the caller. On cross-examination, Stewart could not remember if Petitioner had filled out a contact card, but he reviewed his IPRA statement, wherein he stated Petitioner did fill out a card. Stewart denied speaking with Petitioner about his girlfriend or any desire he had to become a Chicago police officer. He likewise denied that Petitioner or his partner offered him a ride back to the CTA station.

¶ 19    Sandra Stewart, Corey Stewart's mother, testified she was asleep at home on the evening of May 12, 2014 when she received a call from Stewart. Stewart told her "Ma, if anything happen to me, the police did it," and then his phone cut out. Sandra attempted to call Stewart back but was unsuccessful. She then called several people in an effort to locate Stewart but was unable to find him. Sandra received another call from Stewart once he got home and Stewart relayed to her what had happened during his encounter with Petitioner. Early the next morning, Sandra picked up Stewart and took him to the emergency room at Christ Medical Center.

¶ 20       Ernesto Gutierrez testified that in May of 2014, he was working at Tulsa Power Service, a gas station located at 3968 South Ashland, when a man came into the store asking to use the telephone. The man explained to Gutierrez that he had been picked up at a public transportation station by police officers who then dropped him off in the neighborhood and he needed to call 911. Gutierrez remembered that the man was angry that something wrong had happened to him, and he wanted to report it to a police sergeant.

¶ 21       Erin Hansen, supervisor of investigations at OEMC, explained that OEMC is responsible for receiving 911 calls, dispatching emergency services for the police and fire departments, and receiving 311 calls. Hansen testified she oversees a group of employees responsible for providing records subpoenaed by other agencies. These records include computer-aided dispatch (CAD) event queries, unit queries[5], audio recordings, and GPS records. A CAD event query is a computerized record of a call for service and contains information regarding the time a call is received, the nature of the call, the location for service, and the officers dispatched to the call. A unit query is a summary of a specific police unit's activity during a particular time frame and includes information regarding any incidents initiated by a field unit. Hansen identified a unit query detailing the actions of unit 7319A[6] from 3:59 p.m. May 12, 2014 to 12:37 a.m. on May 13, 2014. The report indicated that at 9:04 p.m. the officers were out of service, at 9:23 p.m. the officers were cleared from the event or incident they were on and were now available for service, and at 10:47 p.m. the unit was dispatched as an assisting unit to an incident. The unit query did not provide any information regarding the unit's whereabouts between 9:23 p.m. and 10:47 p.m., nor did it reflect any record of communication between the unit and the dispatcher during that period

---

[5]Hansen testified that unit queries are interchangeably called unit history logs.
[6]This was the unit Petitioner and Dodoo were assigned to on May 12, 2014.

of time. On cross-examination, Hansen conceded that it is possible there could be times when a dispatcher might miss a communication or fail to enter a code.

¶ 22        Chicago police sergeant Daniel Kranz testified he works in the policy and procedures section of the Chicago Police Department Research and Development Division, where he is responsible for creating and revising department directives.[7] Kranz identified general order GO-3-01-01, which outlines the radio communication policy that police officers are supposed to follow during their tour of duty. Specifically, section 2-H requires a department member to notify the dispatcher of a change in status and their location. Section L-1 requires a police officer, when responding to an on-view incident[8], to immediately notify the dispatcher over the radio and let them know the type of incident and the address or location of the incident. Kranz testified that the reasoning behind the requirement for the officers to notify a dispatcher is two-fold—for officer safety and so they know when an officer is unavailable for assignment. Kranz also identified general order GO6-01-01, which details field arrest procedures to be followed by police officers. Specifically, section II-C requires a transporting officer to immediately[9] transport an arrestee to the district of arrest or the appropriate holding facility when an arrest is effected. Additionally, Kranz identified special order SO6-01-01, which establishes policy and procedures for waiving fingerprinting and releasing an arrestee without charging. Section 3-A of this order directs that, when an officer becomes aware that probable cause for arrest no longer applies and the officer has insufficient reason to detain an arrestee, then the arrestee must be released. In such a scenario, the

---

[7]Kranz explained that Department directives "are documents that are issued in the name of the Superintendent that describe policy and procedures for the Department."

[8] Kranz testified that "[a]n on-view incident [is] an incident that was not assigned by the dispatcher, but that happened to you when you were on your tour of duty."

[9] Kranz explained that "immediately" in this context "would mean that you've established your initial probable cause to arrest, and you have got all the information you would need, such as witness and victim information, and that now you are ready to process the arrestee."

booking process would already have been initiated, so the arresting officer would have to notify a supervisor that they no longer have probable cause and therefore they would recommend the arrestee be released. The district station supervisor can authorize a release without charging. Section 3-A also requires the completion of all necessary reports[10] and that officers follow all reporting procedures.

¶ 23    On cross-examination, Kranz identified special order SO4-13-09, which addresses the documenting procedure for officers who conduct an investigatory stop. He elaborated that contact cards should be used to document investigatory stops[11], but not citizen encounters. The current policy regarding contact cards—which was in place in May of 2014—requires the officers to electronically enter contact cards into an electronic reporting system. In the past, the contact cards would be dropped in a bin on a desk and someone else would then be responsible for entering the cards.

¶ 24    Chicago police officer Trak Slapaduriyang testified he has worked as a training instructor at the Chicago Police Academy since 2009. Slapaduriyang specializes in use of force and control tactics and teaches officers handcuffing policies and procedures. He detailed the mechanics of a pair of handcuffs and demonstrated how to properly apply handcuffs to a suspect. Slapaduriyang explained that there are five principles that must be applied prior to taking someone into custody: (1) stabilizing the situation, (2) controlling the subject, (3) applying the handcuff, (4) searching the subject, and (5) transporting the subject. Prior to transportation, the police officer should check for comfort to ensure the cuffs are not too tight on the subject. While handcuffs are not meant to be comfortable, Slapaduriyang stressed the importance of ensuring blood flow is not constricted

---

[10]These reports may include a supplementary report, a vice case report, or any other accompanying reports.

[11]Kranz testified that an investigatory stop and a temporary detention are the same thing.

and that no nerves are pinched. Slapaduriyang detailed four indications that handcuffs may be too tight—if a subject complains, when a police officer cannot get their pinky finger in the cuffs, when the subject's hands start paling, and if the subject states that they cannot feel their fingers. He additionally explained that handcuffs must be double locked to prevent a suspect from picking the lock or accidentally tightening the handcuffs further. Following his handcuff demonstration, an impression[12] remained on Slapaduriyang's left wrist. He explained that such a mark is common to see after handcuffing and, in his experience, the mark would last for maybe a day or two, depending on the person's skin sensitivity.

¶ 25        Chicago police officer Chandler Jones was called as a character witness for Petitioner. Jones, who has known Petitioner for more than 40 years, testified that they grew up together and he considers Petitioner to be like a brother to him. While they had briefly worked together in a professional capacity, Jones and Petitioner were never assigned as partners. Jones described Petitioner as an extremely laid-back, friendly, and compassionate person with no malice. On cross-examination, Jones admitted that he had never seen Petitioner conduct police work on the street.

¶ 26        Alvin Dewayne Owens was additionally called as a character witness. Owens, a licensed barber at Brian Keith's Grooming Lounge and director of Education Youth Development Outreach (EYDO) has known Petitioner for over 30 years. Petitioner has been involved with EDYO, which takes inner city students from all over the country and brings them to visit colleges and universities, for 20 years. Petitioner helps Owens organize the business and volunteers. Owens described Petitioner as a "go-getter" with a humorous personality, a "natural born organizer," and a dedicated, loyal, honest, community-oriented, family person. On cross-examination, Owens admitted he had never personally observed Petitioner conduct police work.

---

[11]Slapaduriyang described the impression as a "little red mark on the skin itself."

¶ 27    Ursula Phoenix, a senior systems analyst, was next called as a character witness. Phoenix testified she has known Petitioner for over 20 years. According to Phoenix, Petitioner has a "very kind" demeanor and is thoughtful and purposeful in his treatment of others. Additionally, Phoenix testified that Petitioner does a lot of volunteer work, participates in community events, and is a careful, attentive father. On cross-examination, Phoenix conceded she has never observed Petitioner in his capacity as a police officer.

¶ 28    Chicago police officer Jonas Dodoo testified he has been assigned to the mass transit unit for six or seven years and has been a police officer for eight years. On May 12, 2014, Dodoo was working the third watch with Petitioner as his partner. The officers had been assigned to a "robbery/theft mission" focused on the CTA Red Line, from the Cermak-Chinatown station to the end of the line at 95th/Dan Ryan. Dodoo was driving an unmarked police vehicle and he was dressed in civilian clothes. After parking by the 55th Street CTA stop, Dodoo saw Stewart come up the escalator. Dodoo testified Stewart walked "back and forth around the vehicle," before spitting on the front passenger bumper of their police vehicle. After further questioning, Dodoo clarified that, to the best of his recollection, he had not seen Stewart spit. Rather, Petitioner had informed him that Stewart had spat on their vehicle. Petitioner then exited the vehicle. When Dodoo exited the vehicle to back up Petitioner, he saw Stewart was already in handcuffs. Stewart was then placed in the back of their vehicle and Dodoo drove off in the direction of the 9th District police station. Dodoo testified that Petitioner had informed him that he wanted to charge Stewart "for either disorderly conduct or what." He reiterated that he did not know what happened before he came around the corner.

¶ 29    Dodoo recalled that Stewart and Petitioner had a conversation while he drove, but he could not remember what they talked about, as he was focused on driving. He drove from the CTA stop,

took a right on Halsted Street, and then drove to 39th Street. However, prior to reaching 39th Street, Petitioner asked Dodoo to turn right so Petitioner could continue talking to Stewart. When the vehicle reached Damen, Petitioner asked Dodoo to pull the car over so he could talk to Stewart a little more. After Dodoo pulled the vehicle over, Petitioner opened his door and Dodoo began to exit the car. Petitioner then asked Dodoo to remain in the vehicle so Petitioner could talk privately with Stewart outside the car. Dodoo did not hear any of the conversation while he waited in the car. After some time, Dodoo exited the vehicle and asked Petitioner what was going on. Petitioner responded that he had decided to let Stewart go and Dodoo inquired if Petitioner had completed a contact card. Petitioner informed him he was completing a contact card, and Dodoo saw Petitioner holding a white piece of paper. Stewart made no complaints to Dodoo and did not tell Dodoo that Petitioner had struck or punched him. At that point in time, Stewart's handcuffs were off, and he never heard Stewart complain that they were too tight. Dodoo denied that he had heard Petitioner say "[l]et's take him to the basketball courts" or "[w]e should take him to Rogers Park like we did the last guy." He further denied he had ever transported an individual to Rogers Park with Petitioner and testified that he would not have known what "take him to the basketball courts" meant.

¶ 30    Once Dodoo learned Stewart was released, he told Stewart to get back into the police vehicle so he could take him back to 55th Street. Stewart, however, declined Dodoo's repeated offers to drive him back, explaining that he did not want to risk Petitioner changing his mind. Dodoo testified that Stewart assured him he knew where he was and could get home himself. While Dodoo was unsure if Stewart appeared afraid, he denied that Stewart ever told him he was afraid of Petitioner. Dodoo also denied that Petitioner ever told him to drive away, and he stated that he never left their sight. Dodoo did not see any physical interaction between Petitioner and Stewart

while they were outside their vehicle. He could not remember if either he or Petitioner made any radio communications with OEMC.

¶ 31       Attorney Randy Crumpton was called as a character witness for Petitioner. Crumpton testified he had known Petitioner since 1988 when they met in their college fraternity. He described Petitioner as a very good friend, who is a good, genuine, compassionate, caring individual, whom he would entrust with his life. While Crumpton was in the hospital with a critical disease, Petitioner came to visit him. Crumpton conceded he had never worked with Petitioner in his capacity as a police officer.

¶ 32       Lastly, Petitioner testified in his own defense. Petitioner testified he is married with three children and was born and raised in Chicago. He earned a bachelor's degree in arts and science and completed a master's degree in public administration. Prior to his work as a police officer, Petitioner worked as an executive assistant for both a radio station and Westin Hotel, and worked for Capitol Records in California. Petitioner testified he is involved in various community organizations and a mentoring program. He was appointed to the Department on December 13, 1999. Over his tenure as a police officer, he was assigned to the 19th District, Area 5, and he assisted at Ground Zero after the World Trade Center attack.

¶ 33       Dodoo was Petitioner's partner on the day in question, but they were not regular partners, and their relationship was purely professional. Petitioner and Dodoo were at the Garfield CTA Red Line station that evening for a premises check. As they drove up to the station, Petitioner observed Stewart "fixat[ing]" his eyes towards their vehicle, giving a dirty look. As Stewart's actions had raised Petitioner's suspicions, Petitioner watched Stewart through the side-view mirror. He observed Stewart walk 10-15 feet towards the vehicle and spit near the front tire of the car. After further questioning, Petitioner stated that the video recording of the incident seemed to show

Stewart spitting toward the rear of the car and not the front. Petitioner denied feeling angry that Stewart had spat near their vehicle. Petitioner testified that he exited their vehicle because he wanted to do a field interview on a subject he felt was "suspicious." Petitioner denied swearing at Stewart and stated he had decided to write a citation for disorderly conduct. Petitioner "felt threatened by [Stewart's] evasive nature," and handcuffed him for Petitioner's own safety. After handcuffing Stewart, he placed him in the back of the vehicle and proceeded to enter and sit in the passenger side.

¶ 34     As Dodoo drove the vehicle, Petitioner carried on a conversation with Stewart, informing him that they had "no intention" of arresting him and just wanted to write a citation. However, Petitioner then realized he did not have any citations and decided to go to the station to get a new book of citations. Stewart remained handcuffed during the duration of the drive, for the officers' safety. Petitioner denied that he ever told Dodoo they should "take him to Rogers Park like the last guy who we made walk home." He further denied ever transporting someone to Rogers Park and releasing them there. Petitioner testified that, as they got closer to the station, Stewart's demeanor "completely reversed" and he became cooperative. He confirmed that he had asked Dodoo to keep driving so he could continue to talk to Stewart. They spoke about Stewart's job, his desire to study for the police test, and Stewart's girlfriend. Deciding he did not want to ruin Stewart's career, he determined he would not arrest Stewart and instead asked Dodoo to pull the vehicle over. They were close to McKinley Park; however, Petitioner testified that he did not know at the time that it was McKinley Park. Petitioner elaborated that he asked Dodoo to pull over because he wanted to "really see" if Stewart was "okay with not being arrested." After determining Stewart did not want to be arrested, Petitioner exited the vehicle and let Stewart out. Petitioner then unlocked the

handcuffs and explained to Stewart that he was not going to arrest him. Petitioner denied telling Dodoo to drive away and come back later, and stated that Dodoo never left the scene.

¶ 35    While they stood outside the vehicle, they discussed Stewart's desire to become a police officer and Petitioner gave Stewart suggestions that would help him with his goal. At some point, Dodoo exited the vehicle and told Stewart that Petitioner was not going to lock him up or write a ticket. Petitioner refuted recovering a badge from Stewart and mimicking Stewart for trying to impersonate the police. When Stewart asked Petitioner for his name, he gave him that information. Petitioner then asked Stewart for information, including his driver's license, so he could document his contact with him. Despite it being dark, Petitioner tried to read the license and fill out a contact card. Petitioner denied slapping or punching Stewart and refuted that Stewart ever complained that he had been injured, or that the handcuffs were too tight. Petitioner likewise denied purposefully avoiding communication with OEMC in an attempt to cover up Stewart's detention. Petitioner testified that he thought Dodoo might have offered to drive Stewart back to the Garfield Red Line station. Stewart was "really happy and fine" that he was not going to be locked up and said he would get himself home. Petitioner did not intend to leave Stewart at the basketball court as a form of punishment for having spit near their vehicle. He testified he would never do something like that. After Petitioner got back into the vehicle, they did a U-turn to head back towards the expressway and Petitioner waived goodbye to Stewart. Petitioner testified he turned in the contact card he completed, along with additional reports, to his supervisor. After the day in question, Petitioner remained a police officer for over two years until he was stripped of his powers.

¶ 36    On cross-examination, Petitioner stated that he could not recall if, during his IPRA statement, he had mentioned disorderly conduct or the fact that he was out of citations that day. Petitioner also could not recall if he was asked during his statement which citation he planned on

issuing Stewart. Counsel for the Superintendent then impeached Petitioner by omission, admitting the entirety of Petitioner's IPRA statement to demonstrate that Petitioner never mentioned wanting to cite Stewart for disorderly conduct, nor did he mention that he did not have any citations on his person that evening.

¶ 37    Following the hearing, the members of the Board: (1) read and reviewed the record of the proceedings, (2) viewed the video recording of the witnesses' testimonies, (3) listened to the hearing officer's oral report, and (4) conferred with the hearing officer. Thereafter, the Board issued a decision finding Petitioner guilty of violating Rules 1, 2 (Counts I, III, IV, and VI through IX), 6, 8 (Counts I, III, and V), and 10 in that he: (1) seized and/or arrested and/or detained Stewart without justification; (2) handcuffed and/or arrested and/or placed Stewart in his police vehicle and transported him to McKinley Park, without justification and/or against Stewart's will, instead of immediately transporting him to the 9th District police station; (3) he transported Stewart to, and subsequently abandoned him at, McKinley Park; and (4) he handcuffed and/or arrested Stewart and/or subsequently transported him without (a) notifying the dispatcher via voice radio of the incident and his change in availability status, and (b) completing all necessary reports and/or reporting procedures and advising proper supervisors.

¶ 38    However, the Board found Petitioner not guilty of violating Rules 2 (Counts II and V), 8 (Counts II and IV), and 9, regarding the allegations that Petitioner handcuffed Stewart too tightly and slapped and/or punched Stewart.

¶ 39    Based upon his various violations, the Board determined, by unanimous vote, that cause existed to discharge Petitioner. The Board considered the facts and circumstances of Petitioner's

conduct, as well as the evidence he presented in mitigation.[13] Nevertheless, the Board concluded that all of Petitioner's accomplishments did not mitigate the seriousness of his misconduct. Specifically, the Board found that Petitioner seriously abused his authority as a police officer when he violated Stewart's constitutional rights. Moreover, it found Petitioner brought discredit to himself and the Department, and that Petitioner created a risk for taxpayers in his handling of Stewart. Ultimately, the Board resolved that Petitioner's abuse of authority was incompatible with continued service as a police officer.

¶ 40    On September 28, 2017, Petitioner filed a "Complaint for Administrative Review" in the circuit court, arguing that the Board had violated his procedural rights and exceeded its jurisdiction. Further, Petitioner contended the Board's decision to discharge him was arbitrary, capricious, against the manifest weight of the evidence, clearly erroneous, and contrary to governing law. Some months later, Petitioner filed a brief in support of his petition for administrative review. Thereafter, the Superintendent filed a response, alleging the Board's findings are consistent with the manifest weight of the evidence and the penalty of discharge is not arbitrary, capricious, or unrelated to the needs of service. Petitioner responded by filing a reply brief wherein he claimed the Board's findings are clearly erroneous and his discharge was arbitrary, capricious, excessive, and unreasonable.

¶ 41    On June 14, 2018, after a hearing, the circuit court affirmed the Board's findings of fact and conclusions of law. However, the court reversed the Board's discharge order and remanded for imposition of a lesser sanction, finding that, in fairness to Petitioner's 17-year history as a police officer, the discipline should be something less than outright discharge. On August 9, 2018,

---

[13]Specifically, the Board pointed to the testimony of Petitioner's four character witnesses, and his 17-year career, during which time he earned 43 total awards and had no sustained complaints on his disciplinary record.

the Board issued a new order. In its order, the Board found that, "after re-evaluating the discipline imposed on Officer Posey, the Board remains convinced that a penalty of discharge in this case is warranted based on the seriousness of the misconduct of which the Board found the [*sic*] Officer Posey guilty." The Board concluded that "[t]here are cases where, despite an otherwise fine and unblemished career, the seriousness of the conduct at issue, in and of itself, warrants discharge. With complete respect to the Court, we continue to strongly believe that this is such a case." Nonetheless, the Board—in compliance with the circuit court's order to issue a sanction less than discharge—imposed a five-year suspension on Petitioner. The circuit court affirmed the Board's five-year suspension order on September 18, 2018. Thereafter, both the Superintendent and Petitioner filed the instant appeals.

¶ 42                                    III. ANALYSIS

¶ 43        On review, the Superintendent presents the question of whether, considering Petitioner's conduct, the Board's decision to discharge him was not arbitrary, unreasonable, or unrelated to the requirements of Petitioner's service as a police officer.[14] Petitioner, on the other hand, questions: (1) whether the Board's findings of facts and conclusions of law were clearly erroneous, and (2) whether the Board's decision on remand to suspend Petitioner for five years was excessive, arbitrary, unreasonable, or unrelated to the requirements of his service as a police officer.

¶ 44        In an appeal from the judgment of an administrative review proceeding, we review the decision of the Board, not the circuit court. *Remus v. Sheahan*, 387 Ill. App. 3d 899, 901 (2009). Our review of an administrative agency's decision to discharge requires a two-step analysis. *Siwek v. Police Bd. of City of Chicago*, 374 Ill. App. 3d 735, 737 (2007). First, we determine whether the

---

[14]The Superintendent does not argue on appeal that the Board erred by finding Petitioner did not violate Rules 2, 8, and 9, regarding the allegations that Petitioner handcuffed Stewart too tightly and slapped and/or punched Stewart.

Board's factual findings are against the manifest weight of the evidence. *Id.* Secondly, we must determine whether those findings of fact provided a sufficient basis for the Board's decision of discharge. *Id.*

¶ 45                    A. The Board's Factual Findings

¶ 46        As an administrative agency, the Board's findings and conclusions on questions of fact shall be held to be *prima facie* true and correct on review. 735 ILCS 5/3-110 (West 2020). A Board's decision regarding factual findings is only contrary to the manifest weight of the evidence "if, after reviewing the evidence in a light most favorable to the agency, we conclude that no rational trier of fact could have agreed with the agency's decision and an opposite conclusion is clearly evident." *Daniels v. Police Bd. of City of Chicago*, 338 Ill. App. 3d 851, 858 (2003). The Board's findings of facts will not be reversed simply because we might have ruled differently, or an opposite conclusion might be reasonable. *Roman v. Cook County Sheriff's Merit Bd.*, 2014 IL App (1st) 123308, ¶ 67. Furthermore, "[w]e may not substitute our judgment for the Police Board's credibility determinations." *Franko v. Police Board of the City of Chicago*, 2021 IL App (1st) 201362, ¶ 46. See *Gounaris v. City of Chicago*, 321 Ill. App. 3d 487, 490 (2001) ("Because the weight of the evidence and the credibility of witnesses are uniquely within the province of the administrative agency, there need only be some competent evidence in the record to support its finding." [Citation].).

¶ 47        Based upon our review of the record, we cannot say that the police board's findings were against the manifest weight of the evidence. Stewart testified that, on the night in question, he was waiting for the bus outside of the Garfield Red Line station when, due to a cold, he walked to the curb to spit into the street. Immediately thereafter, Petitioner, without justification, called Stewart to his unmarked police vehicle, cursed at him, handcuffed him very tightly, and placed him into

the car. Petitioner told Dodoo "[w]e gonna take this one to the basketball court," and stated to Stewart that "the last mother f*** who did this, we took him to Rogers Park and made him walk back." Stewart did not hear either police officer use their radio to notify dispatchers of the encounter. When Dodoo eventually pulled the vehicle over, Petitioner removed Stewart from the rear seat and Stewart realized they were at a basketball court in a park. Stewart testified that Petitioner then slapped, punched, and mocked him, before removing the handcuffs and releasing him. Petitioner told Stewart his name and completed a contact card. Stewart testified he did not know where he was and denied that either police officer had offered him a ride back to the Red Line station. After he walked some distance, he saw a gas station and asked a worker to use the phone. He again called 911 to ask for a supervisor, but after 40 minutes of waiting, nobody came, and he took the bus home. When he went to the hospital the next day, medical records indicated tenderness over the right lateral rib and an area of abrasion with underlying swelling on the radial surface of the distal forearm.

¶ 48        Petitioner's own testimony established that he encountered Stewart on the night in question in front of the Garfield Red Line station, when he observed Stewart standing with a "dirty look." This raised Petitioner's suspicions, so after Stewart spit into the street, he decided to write Stewart a citation for disorderly conduct. He "felt threatened by [Stewart's] evasive nature," so he handcuffed Stewart and placed him in his police vehicle. Contrary to his IPRA statement, Petitioner testified he had no intention of arresting Stewart. Petitioner further denied that he had told Dodoo to take Stewart to the basketball court. Rather, Petitioner testified he decided he did not want to ruin Stewart's chances of becoming a police officer and decided to release Stewart where they were at the time. This was in contradiction to Petitioner's IPRA statement where he stated that they took Stewart as far west as they could towards the address that Stewart had given

them as his final destination. Petitioner stated he was unfamiliar with where they released Stewart and did not know they were at McKinley Park. He denied striking or slapping Stewart and stated Stewart was so happy that they were not arresting him, that Stewart stated he could get himself home. Petitioner stated that he could not remember if either he or Dodoo communicated with OEMC to inform them of their status and their encounter with Stewart. Petitioner testified he completed a contact card and later turned it in to his supervisor.

¶ 49     Dodoo testified he did not see Stewart spit near the vehicle and instead deferred to Petitioner, who had seen the interaction. Furthermore, by the time Dodoo exited the car, Petitioner had already handcuffed Stewart. He stopped the car when Petitioner requested him to, and he remained in the vehicle while Petitioner spoke with Stewart. Dodoo stated he offered Stewart a ride back to the CTA stop, but Stewart refused. He did not remember if either he or Petitioner made radio communications with OEMC dispatchers.

¶ 50     Gutierrez, the employee that was working at the gas station where Stewart borrowed the phone, testified Stewart explained to him that he was picked up by police officers—for no reason— and was dropped off in an unknown neighborhood. Gutierrez explained that Stewart was angry and used their phone to call 911.

¶ 51     Additionally, Sergeant Kranz identified several general and special orders that outlined (1) radio communication policies for police officers, (2) field arrest procedures, (3) policy and procedures for waiving fingerprinting and releasing an arrestee without charging; and (4) documenting procedures for investigatory stops.

¶ 52     Hansen identified the CAD system report for Petitioner's vehicle on May 12, 2014, and the document indicated that between 9:23 p.m. and 10:47 p.m., they had no communication with a dispatcher.

¶ 53    Further, the stipulated GPS records entered into evidence at the hearing corroborated Stewart's account of the events.

¶ 54    Clearly, this evidence—taken in its entirety, in a light most favorable to the Board—supported the Board's determination that Petitioner disregarded his duty and seriously abused his authority as a police officer when he, without justification, detained, handcuffed, and transported Stewart to McKinley Park, abandoning him. Accordingly, it was not against the manifest weight of the evidence for the Board to determine that Petitioner's conduct was violative of the Department's rules and regulations regarding the conduct of police officers. Specifically, we affirm the Board's findings that Petitioner violated Rule 1's prohibition on conduct which violates any law or ordinance, Rule 2's prohibition on conduct impeding the Department's efforts to achieve its policy and goals or discrediting the Department, Rule 6's prohibition on disobeying either an oral or written order or directive, Rule 8's prohibition against disrespecting or maltreating any person whether on or off duty, and Rule 10's prohibition on inattention to duty.

¶ 55    Petitioner, however, argues that this appeal presents a mixed question of fact and law, where the Board misconstrued Petitioner's detention of Stewart as an arrest. In cases where there is a mixed question of law and fact, we review under the clearly erroneous standard. *Roman*, 2014 IL App (1st) 123308, ¶ 70. Under a clearly erroneous standard, deference is afforded to the Board's experience and expertise, and the Board's findings must be accepted unless, "after reviewing the record, we are left with the 'definite and firm conviction that a mistake has been committed.' " *Id.* (quoting *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 391-95 (2001)). We find Petitioner's argument unavailing, where Petitioner was charged with, *inter alia*, having (1) "seized and/or arrested and/or detained Mr. Corey Stewart without justification," and (2) "handcuffed and/or arrested Mr. Corey Stewart; and/or placed Mr. Stewart

in Chicago Police Department vehicle #4545; and/or subsequently transported Mr. Stewart." Clearly, by Petitioner's own testimony, he "seized," "handcuffed," and "detained" Stewart. Whether or not the Board found Stewart was under arrest, or simply detained, the evidence supported the conclusion that Petitioner violated the Department's rules and regulations.

¶ 56                                B. Cause for Termination

¶ 57        Next, we must determine whether the Board's findings of fact "provide a sufficient basis for the agency's conclusion that cause for termination does or does not exist." *Siwek*, 374 Ill. App. 3d at 737. An administrative agency's finding of cause for discipline "demands the respect of the court," *Swanson v. Board of Police Commissioners,* 197 Ill. App. 3d 592, 606 (1990), and we correspondingly "will not disturb the finding of cause for discharge unless the finding is arbitrary, unreasonable, or unrelated to the requirements of service." *Remus*, 387 Ill. App. 3d at 904.

¶ 58        A police officer may not be discharged without cause. 65 ILCS 5/10-1-18(a) (West 2020). Our supreme court has defined "cause" as " 'some substantial shortcoming which renders [the employee's] continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as good cause for his [discharge].' " *Lesner v. Police Board*, 2016 IL App (1st) 150545, ¶ 45 (quoting *Walsh v. Board of Fire & Police Commissioners*, 96 Ill. 2d 101, 105 (1983)). The Board stands in the best position to determine the effect of a police officer's conduct on the Department, not the court of review. *Id.* Accordingly, we give considerable deference to the Board's determination of cause. *Valio v. Board of Fire & Police Commissioners*, 311 Ill. App. 3d 321, 330-31 (2000)). In reviewing an administrative discharge decision, "we may not consider whether we would have imposed a more lenient disciplinary sentence," rather, our "review is limited to a determination of whether the Board acted unreasonably or arbitrarily by selecting a type of

discipline that was inappropriate or unrelated to the needs of the service." *Krocka v. Police Board of the City of Chicago*, 327 Ill. App. 3d 36, 48 (2001) (citing *Wilson v. Board of Fire & Police Commissioners*, 205 Ill. App. 3d 984, 992 (1990)).

¶ 59    Petitioner argues his conduct on the date in question does not warrant dismissal. However, that his termination "arose from a single incident does not 'preclude a discharge for cause assuming that the conduct is of a nature that sound public policy would recognize as good cause for no longer occupying the position of police officer.' " *Lesner*, 2016 IL App (1st) 150545, ¶ 46 (quoting *Humbles v. Board of Fire & Police Commissioners*, 53 Ill. App. 3d 731, 734 (1977)). In assessing the penalty here, the Board thoroughly considered all witness testimony regarding Petitioner's conduct, the evidence proffered at the hearing, and the evidence Petitioner offered in mitigation. The Board deemed that discharge was an appropriate sanction because "Officer Posey's serious abuse of his authority on the night in question—his violation of Mr. Stewart's constitutional rights and several Department rules and policies—is incompatible with continued service as a police officer." It explained that "[i]ndividuals have a right to be free from unreasonable seizure by the police, and well-trained, competent, and law-abiding police officers do not arrest people for having a 'dirty look' on their face, they do not fail to communicate that they have made an arrest in clear violation of Department policy, and they then do not then [*sic*] release a detainee at some location of which they themselves are entirely unaware."

¶ 60    While the Board considered Petitioner's testimony that he intended to arrest Stewart for disorderly conduct, it found that "there is nothing even in Officer Posey's own testimony to form any basis for believing Mr. Stewart engaged in any disorderly conduct or any other conduct that warranted deprivation of his liberty, however briefly." The Board concluded that Petitioner's "conduct is sufficiently serious to constitute a substantial shortcoming that renders his continuance

in his office detrimental to the discipline and efficiency of the service of the Department, and is something that the law recognizes as good cause for him to no longer occupy his office."

¶ 61    Nevertheless, Petitioner argues his discharge was too severe a punishment when compared to the fact patterns of other reported disciplinary cases. In fact, Petitioner contends that *any* discipline imposed by the Board is "excessive, arbitrary and capricious," considering the lack of evidence in the record that his partner, Dodoo, received any discipline. Despite Petitioner's argument, discharge can be found regardless of whether other employees have received disparate discipline. "[T]he fact that different individuals have been disciplined differently is not a basis for concluding that an agency's disciplinary decision is unreasonable; such conclusions are appropriate when individuals receive different discipline in a single, identical, 'completely related' case." *Siwek*, 374 Ill. App. 3d at 738. That is not the case here. While Dodoo was involved in the same incident with Petitioner, their roles were not identical, nor were they "completely related," where Dodoo relied upon Petitioner's observations and therefore deferred to Petitioner's judgments and actions regarding the interaction with Stewart.

¶ 62    Finally, Petitioner contends the Board failed to give adequate weight to his stellar 17-year work record, including his 43 awards, which he argues was sufficient to mitigate against an imposition of the extreme sanction of discharge. The record belies the assertion that the Board did not thoroughly consider Petitioner's mitigating evidence. The Board reviewed testimony from Petitioner's character witnesses, noting that a life-long friend and co-worker testified Petitioner was compassionate and treated individuals with respect, and three other friends testified positively about not only his character, but his various contributions to the community. Further, the Board summarized Petitioner's career in its Findings and Decisions, detailing that "Officer Posey has been serving as a police officer for 17 years, during which time he has earned 43 total awards,

including 1 Department commendation, 20 honorable mentions, and 13 emblems of recognition for physical fitness; he has no sustained complaints on his disciplinary history." However, the Board specifically found that "Officer Posey's accomplishments as a police officer, his friends' testimony as to his work and character, and the lack of prior disciplinary history do not mitigate the seriousness of his misconduct." It is undisputed that "[a]n administrative agency need not give mitigating evidence sufficient weight to overcome a termination decision, and a discharge decision made despite the presentation of such evidence is not, without more, arbitrary or otherwise erroneous." *Siwek v. Police Board of City of Chicago*, 374 Ill. App. 3d 735, 738-39 (2007) (citing *Kappel v. Police Board of Chicago*, 220 Ill. App. 3d 580, 596-97 (1991)).

¶ 63        Illinois courts have repeatedly "emphasized that 'a law-enforcement officer is in a unique position of public trust and responsibility.' " *Remus*, 387 Ill. App. 3d at 904 (quoting *Lewis v. Hayes*, 152 Ill. App. 3d 1020, 1025 (1987)). "Officers must act in accord with 'their most fundamental duty as law enforcement officers—to act to protect the public.' " *Id.* (quoting *People v. Sorice*, 182 Ill. App. 3d 949, 956 (1989)). In the present case, Petitioner ignored his duties to uphold the law and protect the public when he, without justification, detained Stewart and drove him to McKinley Park, a place neither he nor Stewart were familiar with, and abandoned him. The efficacy and discipline of a police force is impaired when a police officer fails to abide by the laws he has sworn to enforce. *Krocka*, 327 Ill. App. 3d at 48-49. Accordingly, we conclude that the Board's finding of cause for discharge was not arbitrary, unreasonable, or unrelated to the requirements of Petitioner's service as a police officer in the Department.

¶ 64                                IV. CONCLUSION

¶ 65        Based on the foregoing, we conclude that the Board's initial decision to terminate Petitioner's employment as a Chicago police officer was not erroneous and we therefore affirm

the Board's August 25, 2017 decision. Accordingly, the June 14, 2018 order of the circuit court of Cook County vacating that termination and mandating the imposition of a different, less severe sanction is reversed. Additionally, we reverse the Board's August 9, 2018 order imposing a five-year suspension, and reverse the circuit court's September 18, 2018 order affirming the suspension.

¶ 66        Circuit court judgment reversed.

¶ 67        Board decision affirmed.